## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MARYLAND

**SANDEEP GOPALAN**

1201 Partridge Ln
Winston Salem NC 27106
**Plaintiff**

v.

**RONDALL ALLEN**
**HEIDI M. ANDERSON**
**JASON CASARES**
**UNIVERSITY OF MARYLAND EASTERN
SHORE**
**JAY PERMAN**
**UNIVERSITY SYSTEM OF MARYLAND**

11868 College Backbone Rd
Princess Anne, MD 21853

**Defendants**

**Serve: Anthony G. Brown**
**Attorney General**
**200 St. Paul Place, Baltimore, MD 21202**

**COMPLAINT
FOR
DECLARATORY
AND
INJUNCTIVE
RELIEF**

**Case No.** MJM 25-CV-2469

USDC- BALTIMORE
'25 JUL 28 PM3:37

## COMPLAINT

The Plaintiff is the Founder Director of the Futures Institute at the University of Maryland Eastern

Shore established pursuant to a competitive $4.6 million grant he secured from the US Department

of Education in 2023. On February 27, 2025, Defendants abruptly issued letters to Ph.D. students,

faculty, and staff claiming to have closed the Futures Institute and the termination of their

scholarships, stipends, and pay.  The Plaintiff was not informed despite his constitutionally



1

Rcv'd by: _____

protected rights and liberty interests in the $4.6 million grant he secured. The Defendants' directives conflict with constitutional, statutory, and regulatory rules. In addition, the termination of the Institute violates the express intent of Congress in passing the IGNITE Act that enabled its establishment to build research capabilities in disadvantaged regions. When issuing the letters purporting to terminate the Institute and the funding, Defendants have not referenced or met any legal standards.

Defendants did not even pretend to cite any legal basis to terminate the funding, research, students' scholarship funding, and the Futures Institute's operations and none exists. As a result of this blatantly unlawful act, highly valuable research on cancer, environmental pollution, and AI, representing thousands of hours of research work by the Plaintiff, Ph.D. students and research staff has been stopped. The loss of $4.6 million in funding to the poorest county in Maryland and the consequent loss of indirect taxes, jobs, patents, and research commercialization has caused untold harm without any outweighing benefit.

Plaintiff brings this complaint after being severely harmed by the Defendants' unlawful actions. Given that Defendants' illegal actions are intentional, malicious, and conducted with actual knowledge of their unlawful nature, they are being sued both in their personal and official capacities. Plaintiff requests *inter alia* that the Court declare unlawful Defendants' closure of the Futures Institute; declare Defendants' termination of pay and scholarships unlawful; order Defendants to end their unconstitutional, arbitrary, capricious, unlawful, and retaliatory actions; order Defendants to restore funding to the Futures Institute and reinstate Plaintiff as director, and award substantial punitive damages.

## I.  PARTIES

2

1. Plaintiff Sandeep Gopalan is a resident of North Carolina but resided in Maryland at all times during the events giving rise to this complaint. He is the Interim VP for Research, Vice Provost for Academic Affairs, and tenured professor at the University of Maryland Eastern Shore (UMES). All the facts giving rise to this complaint arose in Maryland.

2. Defendant 1 is Rondall Allen, Provost of UMES. He is a resident of Salisbury, MD.

3. Defendant 2 is Dr. Heidi Anderson, President of UMES. She is a resident of Princess Anne, MD.

4. Defendant 3 is Jason Casares, Director of the Office of Institutional Equity. He is a resident of MD.

5. Defendant 4 is the University of Maryland Eastern Shore, a higher education institution organized under the laws of the State of Maryland within the University System of Maryland based in Princess Anne, MD, with its main campus at 11868 College Backbone Rd., Academic Oval, JT Williams Hall, Princess Anne, MD 21853.

6. Defendant 5 is Jay Perman, MD, Chancellor of the University System of Maryland (USM). He is a resident of MD.

7. Defendant 6 is the University System of Maryland which has oversight of UMES.


## II. JURISDICTION AND VENUE

8. This is a civil action arising under the laws and Constitution of the United States. This court has jurisdiction pursuant to 28 U.S.C. § 1331. This Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–02. This court has authority to award costs and expert fees under 42 U.S.C. § 1988.

9. Venue lies in this district court pursuant to 28 U.S.C. § 1391(b) because the defendants are Maryland residents and all the events described in this Complaint occurred herein.

### III. FACTS COMMON TO ALL COUNTS

10. UMES appointed Dr. Sandeep Gopalan as the Vice Provost for Academic Affairs and Professor in January 2023 after a national search. His graduate and doctoral degrees are from Oxford, where he was a Rhodes Scholar. He has an outstanding record of achievement as a professor at UMES and elsewhere and brought in over $5 million in research grants and 9 Ph.D. students in 2023-24 alone. A further $22 million+ in grant applications with colleagues from Princeton, Yale, the University of Pennsylvania, and the US Naval Research Lab were under review.

11. In December 2023, Dr. Gopalan founded the Futures Institute to conduct inter-disciplinary research into grand challenges to tackle under-researched questions and generate new knowledge. The Institute is funded by a $4.6 million competitive grant from the US Department of Education (**Exhibit A- US Dept of Ed webpage abstract**). 9 Ph.D. students received scholarships from the institute. These students were some of the best and brightest at UMES which has struggled to attract any good PhD students because of its low ranking and poor reputation. The students were interviewed and selected by faculty in various departments to work on important projects in areas including cancer, environmental pollution, AI, etc. They had to follow UMES application procedures and were attached to different academic departments. The institute employed an administrative director and four postdoctoral researchers in addition to several affiliated faculty and was in the process of hiring an additional two staff.

12. In January 2024, following a national search Dr. Gopalan was offered the role of Provost at a prestigious highly ranked institution. He declined that role in exchange for being promoted as Vice President for Research at UMES and commenced the VPR role in

February 2024. Gopalan's performance was exceptional, and he scored the maximum points available during his evaluations in 2023 and 2024.

13. Rondall Allen, a pharmacist, was appointed Provost in about 2022. He has been in other roles since 2015 with catastrophic failures in each and his appointment as Provost without the qualifications to be a professor is extremely unusual.

14. Dr. Heidi M. Anderson assumed the role of President at UMES in 2018. Anderson and Allen have a prior relationship, and the latter was instrumental in Anderson's appointment in conjunction with Jay Perman, Chancellor of the University System of Maryland. Anderson's appointment -- despite her dreadful prior record -- appears to have been arranged by Perman's machinations.

15. There have been numerous whistleblower complaints and other calls for Heidi Anderson to be fired from faculty, students, staff, and alumni. These complaints have been covered up by Jay Perman.

16. Heidi Anderson and Rondall Allen's administration is a criminal enterprise to divert federal and state funds to their benefit. Any opposition to corruption and maladministration is viciously silenced and the campus has a culture of intimidation.[1] Leaders in Human Resources, Finance, marketing, student services, academic schools and departments have been summarily fired by Anderson and Allen during recent years – often for exposing their malfeasance.

17. Anderson is a named defendant in other lawsuits, including those accusing her of fraud, civil rights violations, etc.

---

[1] One local attorney with substantial experience representing UMES faculty and staff described Heidi Anderson as "Stalin" and Jason Casares as "Beria."

18. Defendants 1, 2, 3, and 5 have parasitic and symbiotic relationships and operate as one mind in their nefarious schemes.

19. UMES has some of the worst student outcomes in the United States under Rondall Allen and Heidi Anderson. The 4-year graduation rate is 17% whereas the 6-year graduation rate is about 35% and graduates' median incomes are on par with high school graduates. To Dr. Gopalan's astonishment, Rondall Allen and Dr. Heidi Anderson were indifferent to these outcomes and appeared resentful whenever he mentioned the need to improve.

20. Dr. Gopalan made several presentations to the campus emphasizing the need to improve student outcomes and developed data-driven leading indicators to track and help at-risk students. He also made a presentation in November 2023 to the President's Cabinet about new federal rules aimed at disclosing student earnings and tying federal aid eligibility to a low debt-income ratio. Anderson did not support such disclosure and was resentful.

21. On several occasions in Summer and Fall 2023, Rondall Allen plagiarized Dr. Gopalan's ideas and documents and made presentations at events falsely conveying that it was his work. Allen has no record of original intellectual publications and had copied and pasted Dr. Gopalan's work to steal credit.

22. Dr. Gopalan was also the Accreditation Liaison Officer to UMES's accreditor – Middle States Commission on Higher Education – and was responsible for ensuring that the university complied with its Standards. In 2024, UMES was due for MSCHE's accreditation reaffirmation, and the university had to submit a detailed self-study report addressing compliance with MSCHE Standards. Dr. Gopalan was central to this effort.

23. During his work in preparing the draft Self-Study report, Dr. Gopalan noticed serious problems in compliance across numerous areas of UMES including assessment outcomes, maladministration, faculty and staff grievances, and integrity.

24. Defendant 4, Jason Casares, the Director of the Office of Institutional Equity and Compliance (OIE) holds primary responsibility for grievance and complaints processes. He has personally been accused of rape, although not convicted. Casares has been a defendant in lawsuits filed by employees of this and his previous workplaces including in Arizona, Indiana, and Maryland. He may have been bankrupt at least once. His work performance at UMES follows the same pattern as these cases and there are multiple serious complaints against him.

25. On several occasions in late 2023 and 2024, Dr. Gopalan communicated the serious nature of the problems in writing the self-study report and certifying that UMES operates with integrity to Allen and Anderson. They were angry.

26. Shortly after taking the position as Vice President for Research, Dr. Gopalan learned that Rondall Allen and Heidi Anderson were embezzling iPads intended for poor minorities and diverting those resources to their cronies. The thousands of iPads were purchased from a federal grant awarded by the US Department of Commerce.

27. Gopalan became aware that the Department of Commerce had opened an investigation into the iPad scam and that iPads taken by Allen and Anderson had been identified. At that time, Allen and Anderson attempted to return the devices and cover-up. The Department of Commerce issued a Notice of Noncompliance in October 2024. Such a notice is unusual as agencies typically seek to resolve issues.

28. Gopalan became aware that NASA and the USDA had also issued Notices of Non-compliance in relation to projects under the oversight of Anderson and Allen and that they were not cooperating in good faith in agency audits. These are major problems.

29. Gopalan stressed to his staff in the research office that they had to honestly participate in the Ipad scam investigation and not hide anything. This was reported to Allen and Anderson, and they were not happy with Gopalan.

30. In Research Office meetings, Dr. Gopalan and staff flagged problematic aspects of the scam showing the organized nature of criminal activity. Allen and Anderson's cronies in other states apparently received IT equipment intended for poor citizens of Maryland.

31. When he raised this issue with Allen and Anderson and gently tried to convince them to follow the law it became apparent that they wished to cover up the scam.

32. Heidi Anderson brushed off talk of law and the courts, dismissively stating, "I do not look pretty in orange."

33. After being convinced that the scam was organized criminal activity based on direct observation of the devices' stealthy storage, destruction of evidence, fraudulent documentation, attempts to trick the auditors, the apparent enablement of concealment by University System of Maryland apparatchiks, Dr. Gopalan sent whistleblower letters to federal agencies, the Maryland Attorney General's Office, and the Board of Regents of the University System of Maryland in June 2024.

34. The whistleblower letters specifically mentioned the iPad scam and theft of federal funds in addition to discriminatory workplace practices and a hostile working environment.

35. During a cabinet meeting in July 2024, Dr. Anderson informed the cabinet that she had been alerted about a whistleblower complaint against her and Rondall Allen.

36. Subsequently, in one-on-one meetings, Anderson told Dr. Gopalan that based on the "pattern of words used" she had an idea who wrote the whistleblower complaints.

37. Coevally, Rondall Allen's behavior toward Dr. Gopalan began to change: he exhibited hostility and made veiled threats.

38. Dr. Gopalan submitted additional whistleblower complaints in September 2024. In the letter to the Board, he asked for Jay Perman to be fired for covering up corruption, noting that Perman was not doing his job despite being paid over $1.4 million per year by taxpayers. These letters also flagged the hostile working environment, abuses of employees, and systematic illegal activity. It noted that Perman had not been seen on campus in 2 years despite his ridiculously wasteful salary.

39. About one week after the letter, Perman appeared on campus for a "Town Hall" and parroted Anderson's lies. The faculty largely boycotted the event and there were only about 130 attendees present at the first town hall with the Chancellor in years. About 100 of the 130 attendees were student athletes who were pressured by their coaches to attend. This low attendance at a major event on a residential campus with 3000 students and about 600 employees tells its own tale.

40. In September 2024, Dr. Heidi Anderson asked if the PhD students in the Futures Institute were Black. Dr. Gopalan explained that students were selected based on strict merit, but the projects had a focus on minority populations. Anderson expressed displeasure.

41. In Fall 2024, LaKeisha Harris, a close confidante of Heidi Anderson also asked if the students were Black. Gopalan informed her that merit was the only criterion. Harris was not pleased.

42. Dr. Gopalan was given the worst office of any cabinet member. He repeatedly tried to get office and lab space for Futures Institute personnel from the VP for Administration who identified plenty of vacant space. On each occasion, this was blocked by Rondall Allen with false claims ultimately culminating in a confrontation where Gopalan exposed the fact that dozens of vacant rooms being hoarded by Allen had not been touched in years.

43. In December 2024, he submitted additional complaints to the Board of Regents and federal investigators about Heidi Anderson and Rondall Allen's embezzlement, diversion of federal funds, fraudulent reporting of student data to deceive the government, fraud in connection with physical plant and facilities, and other malfeasance.

44. He also wrote to Jay Perman asking him to do his legal duty and not participate in corruption. The emails were ignored.

45. The USM Board appears to have initiated a sham investigation but inconveniently for them, faculty have confirmed enrollment fraud at UMES via the Hotline. USM should have been on notice from previous complaints by faculty, students, senior administration leaders, and alumni, and a lawsuit against Anderson by a student that Allen and Anderson are running a criminal operation. Gopalan's credibility and specific information confirmed by current faculty ought to have confirmed prior accusations by others and resulted in firing Anderson and Rondall Allen. Perman appears to have neutered the Board to protect his associate, Heidi Anderson.

46. Based on information and belief, during December and January, Rondall Allen, Moses Kairo, Heidi Anderson and Jason Casares began conspiring to steal Dr. Gopalan's Futures Institute grant of $4.6 million and contacted the US Department of Education for that purpose. Dr. Gopalan resisted by contacting the Department himself to convey the truth.

47. Since Dr. Gopalan had originated the ideas, written every word of the project, and was the Principal Investigator of the grant, the US Department of Education blocked the theft of intellectual property by Heidi Anderson and Rondall Allen.

48. In order to retaliate against Dr. Gopalan, Allen sought to unlawfully terminate the admission of several Futures Institute students in January 2025. When the students and Dr. Gopalan complained to the Board of Regents, their admission was restored.

49. Foiled in his corrupt scheme, on or about February 27, 2025, Rondall Allen abruptly informed faculty, staff, and students receiving scholarships from the Futures Institute that it was being shut down by the university. He sought to achieve the exit of innocent students through a backdoor trick – ending their funding to ensure they could not pursue their studies. No justification was provided and there was no reference to any law, rule, regulation, or policy to support the decision. See **Exhibits B and C**.

50. Neither Allen nor Anderson communicated the closure of the Institute to Dr. Gopalan.

51. Allen and his toadies initially tried to falsely communicate to UMES campus that the closure of the institute was due to the Trump Administration's policies.

52. Allen's lies were exposed when Dr. Gopalan was able to obtain written confirmation that the US Department of Education had not terminated the grant but wanted the project to proceed. The email is attached as **Exhibit D**.

53. The federal official's email confirming the funding was also sent to the USM Board of Regents for action. They failed to correct Allen and Anderson based on instructions from Anderson's close associate Jay Perman.

54. Terminations of Ph.D. scholarships and a federally funded research institute are exceptionally rare, especially at a cash-strapped university such as UMES which struggles to attract competitive grant funds and where frontiers research is rare.

55. It is also extremely bizarre for the USM to waste $4.6 million when it is experiencing a budget deficit and implementing furloughs and staffing cuts.

56. In the rare instances where grants are terminated, they are done by the federal agency for cause in accordance with 2 C.F.R. § 200.340 after following due process and providing opportunities for corrective action.

57. The termination notice issued by Rondall Allen fails to consider any reliance interests, the rights of those affected by the stopping of scholarships and pay, the effect on research projects underway, the job losses, the effect on Plaintiff and students' careers, the inability to transfer midstream, the consequences of foregone opportunities, the loss of tax revenue for the state, the loss of research outputs, the loss of research graduates necessary for UMES's Carnegie classification, or the broader purpose of building critical research capabilities for the region and nation.

58. The termination also conflicts with the IGNITE Act, the Uniform Guidance, UMES's statutes, the Maryland Education Code, the USM and UMES Strategic Plans, and the new UMES Research Strategic Plan.

59. Rondall Allen and co-defendants know and are capable of following the procedures mandated for the termination of grants and research institutes. They also know and are capable of following the due process requirements of the US constitution, federal and state laws, and UMES and USM rules and policies. They are also fully aware that their actions are in violation of UMES and USM strategic plans, the state of Maryland's economic development goals, and MSCHE accreditation standards. As such, the violations are intentional, malicious, and done for unlawful purposes.

60. Jay Perman and the USM know and are capable of following the procedures mandated in the Maryland Education Code governing USM oversight of UMES, the US Constitution, federal and state laws, and USM policies. His violations are deliberate and malicious.

61. The termination of the Futures Institute and funding has caused massive, life-altering harmful consequences for Plaintiff and 9 PhD students who were awarded scholarships. A portion of Plaintiff's salary was paid from the grant and the entirety of the project was his intellectual property. Each of the students received a full tuition waiver for 4 years and a

$34,000 research assistantship for 4 years. They were all enrolled in Ph.D. programs that have now been upended. Many have reported experiencing panic attacks, severe anxiety, and health problems because of Rondall Allen and co-defendants' unlawful actions.

62. Several researchers who moved to UMES solely on account of the funding guarantee were being paid about $70,000 per year in compensation. Their lives have now been turned upside down and their careers are in jeopardy.

63. Several UMES faculty were being paid summer stipends, honoraria, and other research-related payments including for supervising PhD students. They have lost significant income and career development opportunities.

64. The violation of Dr. Gopalan's rights and liberty interests has caused him to suffer health and non-economic harm.

65. The PhD students reached out to the US Department of Education and received confirmation that the funding was still available. The official expressed dismay at the actions of UMES administration.

## IV. STATEMENT OF CLAIMS

**COUNT 1: Violation of Substantive and Procedural Due Process under the Fourteenth Amendment to the US Constitution**

66. Defendants violated Plaintiffs' procedural rights guaranteed under the Fourteenth Amendment to the US Constitution in several ways. Dr. Gopalan had protected rights in continuation of the Futures Institute and its competitively secured funding, the property interest in the $4.6 million grant, the academic freedom to conduct research, the funding for tuition and scholarships, the right and privileges associated with conducting Ph.D.

13

education, the students had property interests in accumulated education toward completing a diploma, the right to obtain a Ph.D. degree, the right to publish research, the Plaintiff had a liberty interest in a good name and reputation, and the right to freedom of speech, expression and association. Defendants denied those rights without any notice, without any opportunity of being heard, without any impartial decision-maker assessing the facts before the decision or reviewing the decision after it had been made, and without a single plausible lawful ground for the action.

67. Each of the Defendants knew that their actions were unconstitutional and unlawful but did them anyway. They are not entitled to any qualified immunity because of actual malice and direct knowledge that their actions were unlawful. Aany reasonable person in their position would have known this fact.

68. Continuation of the Futures Institute was costless to the Defendants and would have benefited both themselves and the region and the public interest. Providing notice and an opportunity to be heard would have been also virtually costless and not time-consuming. In any case, it would have outweighed the severe harm caused by not providing such an opportunity.

69. Defendants' actions have caused and continue to cause severe economic and non-economic harm to the Plaintiff by destroying $4.6 million in competitively obtained research funding, terminating career development and educational opportunities, and upending research projects.

## COUNT II: Violation of Title VII: Discrimination, Hostile Work Environment and Disparate Treatment

70. Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq., it is unlawful for an employer to discriminate against any individual on account of his/her race or sex. It is

also unlawful for an employer to engage in disparate treatment in the terms and conditions of employment based on an individual's race or sex.

71. Plaintiff Dr. Gopalan (Asian) and the researchers (White, Asian, and Middle-Eastern) in the Futures Institute are not Black or African-American.

72. Defendants expressed preferences for the hiring of Blacks and subjected Plaintiffs to discrimination and a hostile work environment by unlawfully terminating the funding, illegally closing the Futures Institute, not providing physical facilities although they were readily available and plentiful. Defendants' actions were severe and pervasive and drastically altered the Plaintiffs conditions of employment.

73. As a direct result of the discrimination and hostile work environment Plaintiffs have suffered and continue to suffer severe and pervasive economic and non-economic damages.

74. Other research institutes/grants operated by Africans or Blacks were not terminated even after Notices of Non-Compliance were issued by regulators and where action may have been warranted under the law. These include institutes/grants managed by P. Chigbu, D. Dunn, L. Harris, U. Wiggins, and T. Cornelius. The Futures Institute was targeted for discriminatory treatment because of the Plaintiff's race.


**COUNT III: Retaliation in Violation of Title VII**

75. Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq., makes it unlawful for an employer to discriminate against an individual "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

76. By failing to prevent and enabling or even encouraging a hostile work environment and repeatedly ignoring Plaintiff's pleas, Defendants have violated Title VII.

77. By terminating the Futures Institute which the Plaintiff founded and directed, and terminating the scholarships, fees, and stipends of researchers he recruited because he complained about bullying and a hostile work environment, Defendants engaged in unlawful retaliation and violated Title VII.

78. Defendants' actions caused and continue to cause serious economic and non-economic harm to Plaintiff.

79. Plaintiff's work conditions, employment opportunities, and educational opportunities have been adversely affected by Defendants' unlawful acts because of Plaintiff's objects to hostile and discriminatory treatment.

80. The unlawful employment practices, hostile work environment, and retaliation are intentional and malicious. Defendants engaged in these acts out of pure evil and with the confidence that they are beyond the reach of the law because Plaintiffs do not possess the resources to fight back. Defendants' intentional violations of the law rest on their ability to deploy state resources at taxpayer expense to defend their illegal acts. This is the reason for Heidi Anderson et al to exhibit contempt for the courts and the legal system. The evil and malicious nature of these acts committed with intent to violate the law and severely harm Plaintiffs warrant the imposition of substantial punitive damages.

## COUNT IV: Equity: Violation of Constitutional, Statutory, and Legal Authority

81. Under Article III, section 2, clause 1 of the U.S. Constitution, the federal judicial power extends to "all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority."

82. Assuming that remedies under the federal Administrative Procedures Act or the Maryland Administrative Procedures Act are not implicated here, this court still possesses "some residuum of power" to review agency action that is ultra vires." R.I. Dep't of Env't Mgmt. v United States, 304 F.3d 31, 42 (1st Cir. 2002).

83. Defendants' actions are clearly *ultra vires*. Defendants do not even supply a fig leaf to justify the termination of the Futures Institute and the termination of scholarships, stipends, and pay to the Plaintiff. The terminations have no plausible legal justification and the Defendants cannot even pretend to offer a justification.

84. Defendants' actions are *ultra vires* the Constitution, federal laws, the Maryland Education Code, and USM and UMES statutes.

85. The district court has the power to enjoin *ultra vires* actions, particularly given the intentional and malicious nature of these acts and the severe and pervasive harm caused to Plaintiffs.

86. Defendants have no authority to terminate the Futures Institute and related funding and seek to bypass the requirements for grant terminations specified in the Uniform Guidance.

87. Congress appropriated the funds for designated purposes including the building of research capabilities in disadvantaged regions and Defendants do not possess any authority to terminate funding allocated to Plaintiffs by the implementing agency viz., the US Department of Education.

88. The US federal agency responsible for implementing Congressional appropriations – the US Department of Education – has clearly expressed that view in its communication to the Plaintiff and the Defendants. Mr. Davy clearly explained that funding can only be ended by Congress. This court should extend deference to that communication and declare that the Defendants' actions are *ultra vires*.

89. If the Defendants' actions are not set aside as *ultra vires*, Plaintiff will continue to suffer severe and pervasive harm.

90. This court should quash the purported closure of the Institute and termination of funding and direct the funding and the Plaintiff to be restored.

## COUNT V: Violation of Civil Rights: 42 U.S.C. § 1983.

91. 42 U.S.C. § 1983 provides liability for any person who subjects "under color of any statute, ordinance, regulation, custom, or usage, of any State" another person to the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws ..."

92. By abusing their official positions and under the color of law, depriving Plaintiff of his rights to property, liberty, freedom of speech, association and expression, the right to educational and employment opportunities, the right to federal employment protections, Defendants violated 42 U.S.C. § 1983.

93. Plaintiff has suffered severe financial and non-financial harm and damages as a result of Defendants' unlawful acts.

## COUNT VI: Civil Conspiracy Under 42 U.S.C. § 1985.

94. Defendants entered into a conspiracy to violate Plaintiff's rights upon learning about his complaints starting in or about July 2024. Throughout the next few months including December 2024, January, and February 2025, Defendants met and agreed to unlawfully steal Plaintiff's grant, failing which, terminate the Futures Institute.

95. Defendants Heidi Anderson, Rondall Allen, Jason Casares, and Jay Perman formed an agreement after learning about the emails and complaints filed via the USM Fraud Hotline to illegally retaliate against Plaintiff.

96. Defendants knew and were fully aware that they do not have a legal basis to terminate the Futures Institute or the funding.

97. Defendants had legal counsel including staff from the Office of Attorney General available to them in case there was any doubt about the legality of their actions. However, they continued to engage in unlawful actions maliciously and intentionally and violated 42 U.S.C. § 1985.

98. Defendants undertook several actions in furtherance of their agreement and conspiracy including: creating a hostile environment and targeting Plaintiffs, seeking to end PhD students' admission illegally, orchestrating a fake investigation in response to complaints, covering-up whistleblower complaints, enabling retaliation, contacting the US Department of Education in December 2024, January and February 2025 seeking to steal the grant from Dr. Gopalan, terminating funding to the students, intimidating researchers and students, terminating pay from grant funds to Plaintiff, and closing the Futures Institute.

99. Defendants Jay Perman, Heidi Anderson, Rondall Allen, and Jason Casares colluded and coordinated their actions from about July 2024 onwards in furtherance of the conspiracy to violate the civil and constitutional rights of Plaintiffs.

100.    The actions of each conspirator are imputed to all conspirators.

101.    Each of the conspirators acted with full knowledge that their actions were unlawful and potentially criminal. They were emboldened by the belief that they could use state resources and taxpayer funds to defend against any lawsuits whereas Plaintiff did not possess those resources.

102.    Defendants undertook numerous intimidatory and coercive steps to effectuate the conspiracy and repeatedly refused to cease or desist or take corrective action despite clear evidence that their actions were illegal. Dr. Gopalan sent numerous emails directly to Jay Perman and the Board of Regents outlining their legal obligations but was ignored.

103.    Defendants received clear and unambiguous written communication from the US Department of Education that the termination of the Futures Institute and the scholarships was illegal. The ignoring of this official communication was also in furtherance of the conspiracy.

104.    This court has the power to impose substantial punitive damages and other equitable orders to claw back salaries from individual defendants. This court should direct the University System of Maryland Board of Regents and the Office of Attorney General to claw back Jay Perman's $1.4 million salary, Heidi Anderson's $450,000 salary, and Rondall Allen's $300,000 salary and proportionate amounts from Casares. This claw back is an appropriate equitable remedy in this case due to the harm caused to the public and the state of Maryland by these rogue employees.


**PRAYER FOR RELIEF**

The Plaintiff respectfully request orders:

1.  Directing expeditious resolution of this complaint given the serious and irreparable harm to Plaintiff and innocent research students and faculty from the ongoing unlawful actions of the Defendants;

2. Interim relief to Plaintiff given the balance of convenience is in favor of the Plaintiff and the Defendants suffer no harm from the operation of the Futures Institute but benefit instead;

3. Declaring unlawful and void the Defendants' February 27 directive to close the Futures Insititute and the termination of funding to Plaintiff;

4. Immediate restoration of all scholarships, stipends, honoraria, and other payments owed to Plaintiff and other Futures Institute personnel.

5. Permanently enjoining Defendants and their agents and all persons acting in collusion or concert with Defendants from unlawfully interfering with the functioning of the Futures Institute;

6. A declaration that Defendants engaged in an unlawful conspiracy to violate the Plaintiff's legal rights;

7. Permanently enjoining Defendants from violating Plaintiff's constitutional and civil rights;

8. Entering judgment in favor of the Plaintiff;

9. An order directing the University System of Maryland to commence legal processes to claw back salaries paid to individual defendants and commence disciplinary proceedings for malicious unlawful actions;

10. An award of substantial punitive damages from the University of Maryland Eastern Shore for enabling willful and malicious illegal activities by individual named Defendants;

11. Issuing Plaintiff's fees and other reasonable costs;

12. Awarding any other relief that this court deems to be just and proper.


## Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11. A.

I agree to provide the Clerk's Office with any changes to my address where case- related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated: 7/27/2025

Signature of Plaintiff _____

Printed Name of Plaintiff: Sandeep Gopalan

Address: 1201 Partridge Ln, Winston Salem, NC 27106

Tel: 724-931-2371

Sandeepgopalan@hotmail.com